# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 3, 2015

## STATE OF TENNESSEE v. CEDRIC ROBERTSON

**Appeal from the Circuit Court for Madison County**
**No. 14-49    Roy B. Morgan, Jr., Judge**

---

**No. W2014-01545-CCA-R3-CD  - Filed April 22, 2015**

---

The Defendant, Cedric Robertson, was convicted by a Madison County Circuit Court jury of the sale and the delivery of more than one-half ounce of marijuana, a Class E felony.[1] *See* T.C.A. §§ 39-17-417 (Supp. 2012) (amended 2014), 39-17-415 (2014).  The trial court merged the convictions and sentenced the Defendant as a Range II, multiple offender to four years' confinement.  On appeal, the Defendant contends that the evidence is insufficient to support his conviction.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant Public Defender, for the appellant, Cedric Robertson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to an undercover drug transaction involving a confidential informant. At the trial, Jackson Police Investigator Antonio Rhodes testified that he worked as a gang investigator and that on October 12, 2012, he coordinated an undercover operation with the

---

[1] We note that although the indictment alleged that the Defendant sold and delivered "more than one-half ounce . . . of marijuana," the offense is defined as "not less than one-half (½) ounce . . . nor more than ten pounds . . . of marijuana[.]"  *See* T.C.A. §§ 39-17-417(g)(1).

assistance of Nathan Pigrum, a confidential informant. Mr. Pigrum told Investigator Rhodes that he had purchased narcotics from the Defendant, and Investigator Rhodes and Jackson Police Investigators Harris and Gause decided to conduct a controlled purchase of narcotics from the Defendant. The investigators and Mr. Pigrum met at a secret location, where Mr. Pigrum and his vehicle were searched to ensure Mr. Pigrum did not possess any contraband. Investigator Rhodes and Mr. Pigrum spoke about the operation, and Mr. Pigrum called the Defendant and "ordered" marijuana.

Investigator Rhodes testified that audio and video equipment were placed on Mr. Pigrum, that Mr. Pigrum drove to the Defendant's home, and that the investigators followed Mr. Pigrum in another vehicle. The investigators stayed in the general area during the controlled purchase to keep "a close eye" on Mr. Pigrum. After Mr. Pigrum arrived at the Defendant's home, he knocked on the door, and a man known as "Boo Boo" opened the door. Mr. Pigrum spoke with Boo Boo, entered the Defendant's home, and walked to the rear of the home where the Defendant was lying in bed. Investigator Rhodes said the Defendant and Mr. Pigrum had a casual conversation while Boo Boo entered another room to prepare the marijuana. Mr. Pigrum walked into the room where Boo Boo prepared the marijuana, spoke briefly to Boo Boo, and returned to the Defendant's bedroom. Boo Boo returned to the Defendant's bedroom with marijuana, and "an exchange [was] made."

Investigator Rhodes testified that Mr. Pigrum and the Defendant spoke for a short time and that Mr. Pigrum left. The investigators followed Mr. Pigrum, and they returned to the secret location. Investigator Rhodes collected the marijuana, and he searched Mr. Pigrum and his vehicle again to ensure Mr. Pigrum did not keep any of the drugs. The marijuana had a field test weight of 18.9 grams, and it was sent to the Tennessee Bureau of Investigation (TBI) for analysis. The TBI report showed the substance was marijuana and weighed 17.92 grams.

The audio recording of the Defendant and Mr. Pigrum's telephone conversation was played for the jury. In the recording, Mr. Pigrum told the Defendant that he was attempting to "pull on a little reefer" and asked what he needed to do. The Defendant made a comment about a birthday card. Mr. Pigrum said he needed to make some money so he could obtain a card for the Defendant. The Defendant interjected that he was talking to someone else and told Mr. Pigrum to "come on" after asking if anyone was with Mr. Pigrum. Mr. Pigrum said he was alone, and the Defendant said, "Alright."

Investigator Rhodes identified Mr. Pigrum's and the Defendant's voices in the recording. He identified a photograph of the Defendant's Facebook page and a photograph of the Defendant's business card posted on the Facebook page. He identified the telephone

number on the business card and stated that the recorded telephone call was placed to the same number.

On cross-examination, Investigator Rhodes testified that while Mr. Pigrum was at the Defendant's home, someone mentioned purchasing pain medication. Investigator Rhodes believed Mr. Pigrum was speaking to the Defendant. He agreed Mr. Pigrum and the Defendant spoke about someone's birthday and a birthday card.

Jackson Police Investigator Justin Harris testified that he participated in the controlled purchase on October 12, 2012. He said his only responsibility was to search Mr. Pigrum's vehicle before and after the controlled purchase. He said he found no contraband inside the vehicle before or after the controlled purchase.

Nathaniel Pigrum III testified that he had known the Defendant his entire life. Mr. Pigrum agreed to work for the police as a confidential informant in exchange for a plea agreement in an unrelated case. He admitted his extensive criminal history. On October 12, 2012, he met with the investigators at the secret location and placed a telephone call to the Defendant to "order[]" marijuana. Mr. Pigrum drove to the Defendant's home, obtained the marijuana from a man named Boo Boo, left the Defendant's house, and returned to the secret location. He said he spoke to the Defendant on the telephone and understood Boo Boo was the Defendant's assistant. He said the Defendant was disabled and could not "serve . . . hisself [sic]." He said, though, that he purchased the drugs from the Defendant.

Mr. Pigrum testified that during the recorded telephone conversation, the reference to "[p]ull on the reefer" meant to attempt to get marijuana. Relative to the birthday card mentioned during the call, Mr. Pigrum stated that the Defendant asked him to pick up a birthday card and that he told the Defendant he had to "do something else to get some money" in order to purchase a birthday card. He said, though, he initially thought the Defendant was talking to him about the birthday card but realized the Defendant was talking to someone in the background at the Defendant's house.

The video recording of the controlled purchase was played for the jury. In the recording, the audio and video equipment were given to Mr. Pigrum. Mr. Pigrum entered a vehicle and drove away from the investigators. He received a telephone call during the drive during which he discussed "selling the h--- out of them." Mr. Pigrum arrived at his destination, got out of the car, and knocked on the door of a home. A man opened the door, and Mr. Pigrum entered. Music played in the background. Mr. Pigrum walked to a bedroom in which a man was lying in bed. Mr. Pigrum asked if the man lying in bed if he was well and if he had been waiting for Mr. Pigrum. Mr. Pigrum asked the man lying in bed how much money he wanted for an ounce, but the response was inaudible. Mr. Pigrum said, "Boo

Boo, Boo Boo," and walked to another room, following the man who answered the door. Mr. Pigrum said he had $100 and to make it "look good." Mr. Pigrum returned to the bedroom where the man was lying in bed and asked "what was going on." Mr. Pigrum asked about the birthday card, and the man said he wanted a card that someone would purchase for a girlfriend or wife. The man who answered the door when Mr. Pigrum arrived walked into the bedroom and handed Mr. Pigrum a small bag, and Mr. Pigrum gave him money. As Mr. Pigrum left, he asked the men about a shipment of pain medication. The man who answered the door and gave the plastic bag to Mr. Pigrum said they did not have any but discussed a shipment that had not yet arrived. Mr. Pigrum left, entered his car, and drove away. Mr. Pigrum placed a telephone call, stating "it [was] all good. I'm headed back." When Mr. Pigrum arrived at the secret location, he and the investigators noted that the Defendant whispered during his conversation with Mr. Pigrum.

Mr. Pigrum testified that Boo Boo gave him the marijuana and that he gave Boo Boo the money. He understood that Boo Boo worked for the Defendant. He agreed they discussed a shipment of pain medication coming from Memphis and said the shipment had not yet arrived. He said that after he left the Defendant's home, he drove to the secret location without stopping.

On cross-examination, Mr. Pigrum testified that he and the Defendant had discussed the birthday card before the October 12, 2012 recorded telephone call and that the birthday card was unrelated to the marijuana. He said that the Defendant was a friend and that he previously provided care for the disabled Defendant. He agreed he received a telephone call during his drive to the Defendant's home and said the call was unrelated to this case.

Mr. Pigrum testified that he asked the Defendant how much money he wanted for an ounce but that the Defendant's response was not clear in the recording. After the Defendant told Mr. Pigrum the price, Mr. Pigrum walked to the other room to tell Boo Boo how much marijuana he wanted. Mr. Pigrum said that he returned to the Defendant and that they discussed the birthday card and the shipment of pain medication. He agreed he gave the money to Boo Boo, not the Defendant. He said that he was talking to Boo Boo about the pain medication as he left the Defendant's bedroom. He agreed he had convictions for two counts of aggravated robbery, carjacking, and three counts of felony theft.

The Defendant testified that on October 12, 2012, he received a telephone call from Mr. Pigrum, who wanted to purchase marijuana. He said the marijuana at issue belonged to Boo Boo. He said that during the telephone conversation, he asked another person if the person could "hook . . . up" Mr. Pigrum. Relative to the birthday card, the Defendant said that it was for a female friend and that he asked Mr. Pigrum to bring one when he came for

the marijuana. He denied talking to Mr. Pigrum about the birthday card before the recorded telephone conversation.

The Defendant testified that Mr. Pigrum came to his bedroom when he arrived and that they discussed the birthday card. He told Mr. Pigrum that he would purchase the card himself. He denied Mr. Pigrum asked him about the price of the marijuana and said Mr. Pigrum asked Boo Boo about the price. He said Boo Boo prepared the marijuana for sale, accepted money for the marijuana, and gave the marijuana to Mr. Pigrum. He denied directing Boo Boo what to do. He agreed, though, Mr. Pigrum asked him about pain medication. The Defendant said he told Mr. Pigrum that he did not have any pills. He said Mr. Pigrum discussed the price and from where the medication was coming. The Defendant said he did not know to what Mr. Pigrum was referring. He admitted he was previously convicted of introducing contraband into the Madison County Jail.

On cross-examination, the Defendant admitted that he spoke to Mr. Pigrum on the telephone, that Mr. Pigrum asked about "pull on the reefer," that he told Mr. Pigrum to come to his home, and that the recording showed his home. He said his sister lived with him, and he agreed the marijuana did not belong to his sister. He denied owning the drugs and said he was not actively engaged in the drug transaction.

The Defendant testified that during the recorded telephone conversation, he asked Mr. Pigrum if he was alone but denied he asked because he knew he was about to commit a crime. He said that the marijuana was never stored inside his home and that Boo Boo went outside to get the marijuana for Mr. Pigrum. Although the Defendant did not deny he knew a drug transaction occurred at his home, he denied knowing what was happening at the time of the transaction. He denied knowing Boo Boo's whereabouts. On redirect examination, the Defendant testified that Boo Boo had not been arrested for his involvement.

Investigator Rhodes testified on rebuttal that Forrest Springfield was Boo Boo's legal name. Although he said Mr. Springfield had been indicted for his role in the controlled purchase, Mr. Springfield had not been apprehended by the police.

Upon this evidence, the Defendant was convicted of the sale and the delivery of more than one-half ounce of marijuana. The trial court merged the convictions and sentenced the Defendant as a Range II, multiple offender to four years' confinement. This appeal followed.

The Defendant contends that the evidence is insufficient to support his conviction. He argues the evidence shows that Boo Boo "handled each significant portion of Mr. Pigrum's request for marijuana." The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

It is a crime to sell and to deliver a controlled substance. T.C.A. § 39-17-417(a)(2), (a)(3). Delivery is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." *Id*. § 39-17-402(6) (2014). A sale is "a bargained-for offer and acceptance, and an actual or constructive transfer or delivery" of the substance. *State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). Marijuana is a schedule VI controlled substance. T.C.A. § 39-17-415(a)(1). The delivery or sale of marijuana is a Class E felony if the marijuana sold or delivered is "not less than one-half (½) ounce (14.175 grams) nor more than ten pounds (10 lbs.)[.]" *Id*. § 39-17-417(g)(1).

In the light most favorable to the State, the evidence shows that Mr. Pigrum placed a recorded telephone call to the Defendant during which Mr. Pigrum said he was attempting to "pull on a little reefer." Mr. Pigrum testified that the phrase meant he wanted to purchase marijuana. The Defendant asked Mr. Pigrum if anyone was with him and told Mr. Pigrum to come to his home after learning Mr. Pigrum was alone. Mr. Pigrum drove to the Defendant's home after the police investigators equipped Mr. Pigrum with audio and video recording equipment.

Forrest Springfield, known as Boo Boo, answered the door and permitted Mr. Pigrum to enter the Defendant's home. Mr. Pigrum walked to a bedroom in which he found the Defendant lying in bed. The recording reflects that Mr. Pigrum asked the Defendant how much money he wanted for one ounce. Although the Defendant's response is inaudible, upon hearing the Defendant's response, Mr. Pigrum left the bedroom and entered another

room where he found Mr. Springfield. Mr. Pigrum informed Mr. Springfield of the price and told him to make it "look good." While Mr. Springfield obtained the drugs, Mr. Pigrum returned to the Defendant's bedside. Mr. Springfield returned with the marijuana in a plastic bag, and Mr. Pigrum gave Mr. Springfield the money.

The record reflects that the Defendant was disabled, that Mr. Pigrum did not believe the Defendant was able to care for himself, and that Mr. Pigrum understood Mr. Springfield was the Defendant's assistant. Mr. Pigrum testified that he purchased the marijuana from the Defendant, not Mr. Springfield. Although the Defendant argues the evidence is insufficient because Mr. Springfield answered the door, permitted Mr. Pigrum to enter, weighed the marijuana, and took the money and because the Defendant only requested a birthday card from Mr. Pigrum, this theory was presented to the jury during the Defendant's testimony. We note that this court has upheld a conviction for selling a controlled substance when a third party acted as a defendant's agent. *See State v. Alley*, 968 S.W.2d 314, 315-16 (Tenn. Crim. App. 1997). We also note that the jury was instructed relative to criminal responsibility for the conduct of another. In any event, the jury considered the evidence, and its verdict reflects that it credited Mr. Pigrum's testimony that he purchased marijuana from the Defendant over the Defendant's testimony that the drugs belonged to Mr. Springfield. It is not the province of this court to reweigh or reevaluate the evidence, and the jury determined the credibility of the witnesses. We conclude that the evidence is sufficient to support the Defendant's conviction and that he is not entitled to relief on this basis.

The judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE